# WARREN MANUFACTURING COMPANY OF BALTIMORE COUNTY vs. THE MAYOR & CITY COUNCIL OF BALTIMORE ET AL.

*Baltimore City: Acts of 1908, authorizing increased water supply. Fixtures: mill machinery. Specific performance: discretion of courts; misrepresentation; inadequacy of price.*

By section 15 of Chapter 214 of the Acts of 1908, empowering the Mayor and City Council of Baltimore to enlarge and extend the water supply for the city, the Water Board was expressly authorized to acquire by condemnation or otherwise certain "mills, factories and industrial plants of every description and their appurtenances"; upon a bill for specific performance of a contract by the Water Board to purchase certain lands, mills, etc., *and machinery,* that would be covered by the water of a stream across which it was proposed to erect a dam, it was *held,* that the Act authorized the purchase of machinery in and atached to the mill.        p. 204

The fact that the Act required that the title should be in fee simple to the City of Baltimore does not exclude the right to purchase machinery or other personal property affixed to the freehold.                    pp. 204, 205

While mere inadequacy of consideration is not sufficient ground for refusing to decree specific performance of a contract, yet it may be taken into consideration with other facts in determining the right to such relief.                    p. 213

Where it is shown that one of the parties made representations, whether innocently or fraudulently, as to material matters, which were false and which were relied upon by the other party, or which influenced him in entering into the contract, a Court of Equity will not compel its specific performance.

p. 215

Misrepresentations as to material matters, even innocently made, if relied upon to the extent of making the contract

unconscionable, will debar the party making them from the
aid of equity in its enforcement.                          p. 217

In estimating the net profits of a manufacturing business, an
allowance should be made for the deterioration of machinery;
and the officers' salaries and attorneys' fees should be charged
to the expense account, and deducted from the earnings.

p. 212

Application for specific performance is addressed to the sound
and reasonable discretion of the Court; not to be used arbi-
trarily, but according to fixed and established rules.    p. 205

The Court must be satisfied that the contract sought to be
enforced is fair, just, reasonable and equal in all its parts,
and founded on an adequate consideration, before it will
extend this extraordinary assistance.                      p. 205

Specific performance is not *ex debito justitiæ;* to warrant its
application, the terms of the contract must be fair, founded
on a valuable consideration, and entered into under circum-
stances commending it to the favorable apprehension of the
Court.                                                     p. 205

But if a contract for the sale of real estate is in writing and
is certain, fair, based on adequate consideration and capable
of being performed, it is as much a matter of course for a
Court of Equity to decree its specific performance as it would
be for a Court of Law to award damages for its breach.

pp. 205, 206

Where it is sought to restrain the construction of a dam over
a stream, the work being in the nature of a public improve-
ment authorized by an Act of the Legislature, equity will not
enjoin its construction merely upon the theoretical opinion
as to injury.                                              p. 222

Injunctions should only be granted to restrain an actual exist-
ing nuisance; but where it can be plainly seen that an act
which, when completed, will certainly constitute or result in a
grievous nuisance, or where a party threatents or begins to
do, or insists upon his right to do, certain acts, the Court will
interfere, though no nuisance may have been actually com-
mitted, provided the circumstances of the case enable the

Court to form an opinion as to the illegality of the acts, or of the irreparable injury which will ensue.          p. 222

In such a case, however, the Court must at the time the motion is made, be enabled either to form its own opinion, under the circumstances of the case, as to the legality of the meditated purpose of the defendant, or to put that question on a course of immediate trial; and where that can not be done, the motion for the injunction will not be allowed to stand over until the purpose of the defendant has been so far executed that its character may be judged, but the application will be at once refused, though without prejudice to any future application.          p. 222

The right of every riparian owner is to enjoy a stream of running water in its natural state, as to flow, quantity and quality.          p. 222

Without a grant, either express or implied, no proprietor has the right to obstruct, diminish or accelerate the impelling force of a stream of running water, excepting as to such reasonable use which is common to all.          p. 223

On an application for an injunction to enjoin the Mayor and City Council of Baltimore from constructing a dam across a stream for the purpose of increasing the water supply of the city, evidence showed that the erection of the dam at an elevation of 186 feet would not damage the appellant's property, and as there was no evidence to show that the property would be flooded or damaged by the erection of movable flash boards raising the height of the dam to 192 feet, which were to be removed in advance of a flood, it was *held,* that the application for the injunction should be refused.          p. 223

*Decided January 14th, 1913.*

Appeal from the Circuit Court of Baltimore City (BOND, J.).

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, BURKE, THOMAS, PATTERSON and STOCKBRIDGE, JJ.

*Wm. Sheppard Bryan, Jr.,* and *Edgar H. Gans* (with whom was *Edward N. Rich* on the brief), for the appellant.

*S. S. Field,* for the appellee.

THOMAS, J., delivered the opinion of the Court.

In 1908 the Legislature passed an Act "to empower the Mayor and City Council of Baltimore to establish and maintain a reservoir or lake in the valley of the Gunpowder River, in Baltimore County, for the purposes of augmenting and improving the municipal water supply of Baltimore City," etc.

The first section of this Act (Ch. 214 of Acts of 1908, page 649) authorizes the Mayor and City Council of Baltimore "to convert the entire valley or basin of the Gunpowder river, in Baltimore county, and its dependencies, or so much thereof as may be necessary for the purposes of this Act, from the present dam, at the lower end of Loch Raven, in said county, to the upper end of the village of Phoenix, in said county, or to such point above said village, as may be necessary or proper for the purposes of this Act, into a reservoir or basin for augmenting and improving the municipal water supply of the City of Baltimore; to create, establish and maintain said reservoir or lake and its appurtenances;—to create, establish, set apart and maintain, regulate and protect, afforest or otherwise improve water sheds and reservations along, and, to such full extent of adjacency as may be necessary for the purposes of this Act, adjacent to the waters of said reservoir or lake, for securing a pure, copious and constant flow of water into said reservoir or lake; to create, establish and maintain, construct, erect, lay out and employ all such dams,—instrumentalities or means, as may be necessary or proper, for the

purposes of this Act, including all instrumentalities or means
for diverting, deflecting, disposing of, controlling, collecting,
confining, impounding, storing, protecting, clarifying, puri-
fying, transmitting or distributing or otherwise handling,
water that may be necessary or proper for the purposes of
promoting or securing the full working efficiency and utility
of said reservoir,—to make and enter into any and all con-
tracts, agreements or stipulations germane to the scope of its
power under this Act,—to acquire by gift, purchase, arbitra-
tion, exchange, lease, whatever the duration of the lease, or
other like methods of acquisition, or by condemnation, any
land or property public, quasi public or private, situated
wholly or partly in Baltimore county or in Baltimore City,
or situated wholly or partly in Anne Arundel county or in
any other county of this State, or any interest, franchise,
easement, right or privilege therein, which may be required
for any of the purposes of this Act, including springs, brooks,
creeks, rivulets, rivers or other water courses, mills, fac-
tories and industrial plants of every description, and their
appurtenances, workshops, stores, farm buildings, structures
and erections, churches, grave yards, school houses, or, other
school property, dwelling houses, out-houses, bridges, streets,
alleys, roads and ways, and all other buildings, structures,
erections or improvements of every description, on, over or
under, land, or other property, or any interest, franchise,
easement, right or privilege therein,—and generally to do
and perform all and every such acts or things which, by
anything short of a palpably forced construction, could be
held to be auxiliary or conductive to the proper exercise of
any, or all, of the powers of this Act conferred upon the
Mayor and City Council of Baltimore, or to the effective
accomplishment of the leading purposes of this Act.

The title acquired by condemnation, or otherwise, by the
Mayor and City Council of Baltimore, under this Act, for
the purposes thereof, shall, as to land, or other property, or
things required for said main reservoir or lake, or for sub-
sidiary reservoirs, lakes, ponds or basins, or for said water

sheds or reservoirs, or for surface buildings, erections, struc-
tures, works or things of a permanent character, involving
the idea of exclusive use and occupation by the Mayor and
City Council of Baltimore, be in fee simple, but may, as to
land, or other property, or things, required for other pur-
poses under this Act, be in fee simple, or limited to some
lesser quantum of interest, in point of estate, or duration,
accordingly as the Mayor and City Council of Baltimore
may determine."

Section 15 declares: "That all the powers, including
powers of condemnation, and duties heretofore conferred and
imposed, and all the discretion hereinbefore lodged by this
Act upon and in the Mayor and City Council of Baltimore,
other than the power of passing ordinances hereinbefore ex-
pressly conferred upon it, shall in the name and on behalf
of the Mayor and City Council of Baltimore without the
necessity of any further legislative action by the Mayor and
City Council of Baltimore be exercisable and exercised as
one continuous, unbroken delegation of authority by the
municipal officials or official who may for the time being have
charge of the general municipal water supply of Baltimore
City," except that in the event that the charge of said water
supply shall at any time be confided to one municipal official,
there shall be associated with him until said main reservoir
or lake, etc., shall have been completed, two capable and up-
right citizens of the City of Baltimore to be appointed by the
Mayor, etc.  Section 16 authorizes the Mayor and City Coun-
cil of Baltimore to issue the stock of said corporation for a
sum not exceeding $5,000,000.00 to cover the cost of the
improvements authorized by the Act, and provides that the
money derived from the sale of said stock, not including any
premiums, shall be deposited with the City Register, and be
placed to the credit of a fund to be known as the "Gun-
powder Reservoir Fund," which shall be exclusively applic-
able to the cost of carrying the purposes and provisions of
this Act into execution, and shall be chargeable with no other
items of cost or expense whatsoever, and appropriation to

defray said cost, based upon the estimate of the person charged with the duty of doing the work contemplated by this Act shall be annually included by the Board of Estimates in the usual way in the ordinance of estimates."

Section 17 provides "That in the event of said loan of $5,000,000.00 being approved by the legal voters of Baltimore City as hereinbefore mentioned, but not otherwise, all contracts or agreements, which may have been entered into prior to the passage of this Act, by the Water Board of Baltimore City, in and name and on behalf of the Mayor and City Council of Baltimore with any person or persons, corporation or corporations, for the acquisition for the purposes of this Act, of any land, property or thing shall by virtue of this Act, stand ratified and confirmed as fully in all respects as if the same had been so entered into after the passage of this Act, and the popular approval of said loan."

Prior to the passage of this Act the Water Board of Baltimore City entered into an alleged contract with the Warren Manufacturing Company of Baltimore County for the purchase of the mill and other property of said company situated in the valley of the Gunpowder river. The contract is contained in the correspondence between the Water Board and the Warren Company, beginning with the following letter:

February 17, 1908.

*Warren Manufacturing Company,*
     *Baltimore, Maryland.*

GENTLEMEN:

As to the proposition to acquire the property of the Warren Manufacturing Company, at or near Warren, Md., the Water Board will agree to purchase the same for $725,000.00, subject to the ratification of a loan of $5,000,000, an enabling Act for which is about to be introduced in the General Assembly of the State. The said sum to be paid when available from said loan, with the understanding that the said Water Board will rent said property back to the said Warren Manufacturing

Company for a period of two years from the date of
said payment for the rental of $50,000 a year; said
sum to be deducted from the payment of $725,000, to
be paid as aforesaid.

Very truly,

(Signed)  ALFRED M. QUICK,

*The Water Board of Baltimore City.*

This offer was finally accepted by the Warren Company
on March 3rd, 1908, with the modification that the "pur-
chase price," $725,000.00, was to be paid "out of the pro-
ceeds of the first sale of bonds under the enabling Act
mentioned," and that "the rent for said property" was to
be paid "quarterly in advance".

The issue of the City stock to the amount of $5,000,000
for the purposes specified in Act, was by an ordinance of
the Mayor and City Council of Baltimore submitted to the
legal voters of Baltimore City, and was approved by a
majority of the votes cast at the election held November
3, 1908.

In pursuance of the authority contained in the Act the
Water Board of Baltimore City on the 31st day of July,
1911, passed the following resolution:

"*Resolved,* That the Water Department of Baltimore
City proceed forthwith to construct a dam of such ma-
terial as may hereafter be approved by the Water
Board, to such a height that it will in no manner
impair the property, property rights or water power
of the Warren Manufacturing Company, such dam to
be located 2,100 feet above the present dam at Loch
Raven on the Gunpowder River, measured on axis of
stream, said new dam to be so constructed that it can
subsequently be raised, if occasion requires, to any ele-
vation deemed reasonably necessary for impounding
the available water of said river."

On the 27th of September, 1911, the Warren Manufac-
turing Company of Baltimore County, the appellant, filed its

Bill of Complaint in this case against the Mayor and City
Council of Baltimore and the members of the Water Board
of Baltimore City, alleging the existence of said contract
and the failure of the City to accept the property of the
plaintiff in accordance with its terms; that the defendants
had finally determined to exercise the authority vested in
them by the Act of 1908, and had declared their purpose to
construct in the valley of the Gunpowder river, above the
present dam at the lower end of Loch Raven, "an impound
ing dam to an elevation of 192 feet or thereabouts above
mean tide, and thereby to convert a large part of the valley
of the Gunpowder river into a reservoir or basin for augment-
ing the municipal water supply of the City of Baltimore—
that if the proposed impounding dam is erected to the height
of 192 feet or thereabouts above mean tide, and put in
use, the fall from the lower boundary" of the plaintiff's
property "to the still waters of said dam and down through
said still waters for a distance of several miles, will be only
about 1.80 feet, a fall totally insufficient for the free and
accustomed flow of the water away from" plaintiff's property
"and from the power plant of its aforesaid factory, and a
fall totally insufficient for the continuance and maintenance
of the power in and at said factory;— that the building and
use of the aforesaid dam by the defendant will irreparably
damage" plaintiff's property · "by casting deposits of sand,
silt and other things upon the banks and in the bed of said
river along and through the property of the plaintiff," and
will thereby obstruct and fill up the bed of said river through
said property; that it will at all times during the ordinary
flow of the Gunpowder river greatly impair the water power
now and for more than forty years past used by" the plain-
tiff in operating its said mill, "and that it will be destruc-
tive of the said water power for about six months of each
year, and that it will, during each year, at the time of high
water in said river, inundate and flood" plaintiff's property;
that if the defendants are permitted to construct said dam, as
aforesaid, "the menace which will exist at all times, of dam-

age and injury from floods and back water of the Gunpowder river, will greatly impair and destroy, not only the value of" plaintiff's property, "but the established trade of its aforesaid factory, and render it impossible". for the plaintiff "to retain or secure sufficient number of employees for the operation of said factory."

The last paragraph of the bill alleges "that within the last few days the defendants, the Mayor and City Council of Baltimore, and the present Water Board of said City, have advertised for bids for the work of building the dam mentioned in these proceedings, and have issued certain plans and specifications for the doing of said work—that said plans and specifications show that the aforesaid dam is to be built at a lower elevation than 192 feet above mean low tide;" that the plaintiff "is credibly informed and believes and upon information and belief charges, that the building of the aforesaid dam to the elevation set forth in the aforesaid plans and specifications will cause the same general character of damage and injury to and interference with" the property of the plaintiff, "and with the operation of its aforesaid factory, as is set forth in the bill of complaint, less only in degree, frequency and extent."

The prayer of the bill is for an injunction enjoining the erection of a dam according to said plans and specifications, etc., and for specific performance of said contract.

On the 11th of October, 1911, the present members of the Water Board of Baltimore City were made defendants, and on the 3rd day of January, 1912, on the petition of the plaintiff, the Court below granted an injunction enjoining the defendants, etc., from doing any work in the construction of the dam mentioned until the final determination of the case. The Mayor and City Council of Baltimore and the present members of the Water Board of Baltimore City answered the bill of complaint, and filed a motion for a dissolution of the injunction. The case was set down for a hearing on the motion to dissolve the preliminary injunction, but by agreement of counsel the whole controversy was

considered and disposed of by the Court below, and this appeal is from a final decree dissolving the injunction and dismissing the bill, as against the Mayor and City Council of Baltimore and the present Water Board of Baltimore City, "without prejudice to any new application for an injunction that the plaintiff may think itself entitled to make at any time hereafter, when it shall think that danger of damage to its property more clearly appears."

One of the defences relied on by the defendants is that section 17 of the Act of 1908 only ratifies such contracts, made prior to the passage of that Act, as the Water Board is authorized to make under the provisions of the Act, and that the Act does not authorize the purchase of movable machinery in a mill. If this contention of the defendants was sound, it would be a complete answer to the claim of the plaintiff for specific performance of the alleged contract, for it is conceded that prior to the Act of 1908 the Water Board had no power to make such a contract, and unless it can be fairly included within the terms of section 17 of that Act it is a mere nullity.

The terms of section 17 are general and do not refer to any particular contract. It declares that contracts made by the Water Board prior to the passage of the Act, "for the acquisition for the purposes of this Act of any land, property or thing shall, by virtue of this Act, stand ratified and confirmed as fully in all respects as if the same had been made after the passage of this Act." The words "for the purposes of this Act," and the words "in all respects as if the same had been so entered into after the passage of this Act," clearly indicate that the Legislature only intended to ratify prior contracts of the Water Board for the acquisition of such "land, property or thing" as the City is authorized to acquire under the provisions of the Act. But the more important inquiry in this connection is, does the Act authorize the acquisition of property of the kind mentioned in the contract in question?

The property is described in the correspondence referred to as "all the real estate and interest of every kind in real estate, all the buildings and improvements of every character, all machines and machinery and all water rights and privileges, all unencumbered, which the Warren Manufacturing Company owns in or near the village of Warren, in Baltimore County." This property consists of several mills buildings, equipped with machinery employed in manufacturing cotton duck and operated by water and steam power, about 244 acres of land, a number of dwelling houses, used and occupied by the officers and employees of the company, farm buildings, and a number of other buildings used in connection with the mill.

It appears from the testimony of Mr. Whitman, who made out a list and an estimate of the value of the machinery in and connected with the mill, that the water power machinery and steam engine and boiler were annexed to the land, or built in or annexed to the buildings, and that the water power machinery is connected with the mill by two large shafts, which are supported by and secured to "masonry pier foundations that are probably seven or eight feet above the floor level and about ten feet in one direction by ten or twelve feet in the other," and which were built for that purpose, and that the power is conveyed from these shafts by belts to the line shafts of the mill, which are bolted to the floor, and to the machinery. The heavier looms in the mill are supported by and secured to masonry foundations which were built for that purpose.

By section 15 all the powers conferred by the Act, other than the power to pass ordinances, are to be exercised by the municipal officials who have charge of the municipal water supply of Baltimore City, and these officials constitute the Water Board of Baltimore City. They are authorized to convert the entire valley or basin of the Gunpowder River, or so much thereof as may be necessary, into a reservoir or basin for the purpose of augmenting and improving the water

supply of the city, and to that end they are empowered "to acquire by gift, purchase, arbitration, exchange, lease, whatever the duration of the lease, or other like methods of acquisition, or by condemnation, any land or property * * * which may be required for any of the purposes of this Act, including springs, brooks, creeks, rivulets, rivers or other water courses, mills, factories and industrial plants of every description, and their appurtenances," etc.

The Water Board is, therefore, expressly authorized to acquire by condemnation or otherwise "mills, factories and industrial plant of every description, and their appurtenances," and the appellant has cited many cases holding that the words mills, factories, etc., include all of the machinery annexed to the mill and used therein. *Patterson* v. *Delaware Co.,* 70 Pa. St. 381; *Schott* v. *Harvey,* 105 Pa. St. 227; *Teaff* v. *Hewitt,* 1 Ohio St. 511; *Gibson* v. *Hammersmith Ry. Co.,* 32 L. J. Ch. (N. S.) 337; *Delaware L. & W. R. R. Co.* v. *Oxford Iron Co.,* 36 N. J. Eq. 452; *William Firth Co.* v. *S. Carolina Loan and Trust Co.,* 122 Fed. R. 569; *Dudley* v. *Hurst,* 67 Md. 44.

In the case of *Dudley* v. *Hurst, supra,* the mortgagor owned a farm upon which he had established a canning factory for the purpose of canning fruit, vegetables and corn. The mortgage conveyed the farm, "together with all the buildings and improvements thereon, and the rights, roads, ways, waters, privileges, appurtenances and advantages thereto belonging, or in any wise appertaining." The farm was sold under the mortgage, and the purchasers took possession of the property. After the sale the mortgagor executed a chattel mortgage of the machinery in the canning factory, and the mortgagees in the chattel mortgage were about to sell the machinery under the power of sale contained therein when the purchasers of the real estate at the mortgage sale obtained a preliminary injunction against such sale, upon the ground that the machinery in the canning factory were fixtures, and passed to them under the mortgage sale. In that case the

Court, after stating that the main part of the machinery consisted of a boiler which was placed upon a brick foundation in a boiler house built for that purpose, and connected by pipes with a steam pump and with the kettles and scalder, etc., in the canning house proper, and that in order to move the boiler, pump and process kettles it would be necessary to tear down the boiler house and to tear up the floor of the process room, said: "That the machinery above described, and which constituted the motive power of the factory, is a fixture, and as between mortgagor and mortgagee passed to the latter, we think, well settled. CHANCELLOR JOHNSON, who seems to have favored the relaxation of the ancient rule, as far as practicable, in *McKim* v. *Mason,* 3 Md. Ch. 186, decided that the motive power of a cotton mill, consisting of boiler, engine, etc., passed to the mortgagee, even when they were placed upon the land after the mortgage was executed."

"Many other cases might be cited from other states showing that machinery located as that we have described, passes to the mortgagee, but it is hardly necessary to cite them."

"But it seems to be intimated in *Kerwan* v. *Latour* (1 H. & J. 289), above cited, that, although what was actually fastened to the soil passed by the deed, such parts of the distillery as were not so fixed did not so pass. This case was decided in 1802. But since the decision of that case the doctrine of *constructive* annexation has been much discussed. From the general current of decisions, the following principle seems clearly deducible:

"Where in the case of machinery the *principal part* becomes a fixture by actual annexation to the soil, such part of it as may be not so physically annexed, but which if removed would leave the principal thing unfit for use, and would not of itself and standing alone be well adapted for general use elsewhere, is considered constructively annexed."

"Thus the key of a lock, the sail of a wind mill, the leather belting of a saw mill, although actually severed from the principal thing and stored elsewhere, passed by constructive

annexation.    They must be such as to go to complete the
machinery, which is affixed to the land, and which, if re-
moved, would leave the principal thing incomplete and unfit
for use.    *Beardsley* v. *Bank,* 31 Barber, 619; *Burnside* v.
*Twichell,* 43 N. H. 390.

"In this case there are some articles not actually annexed
to the soil, such as crates, cripping machines and work tables,
but are essentially necessary to the working of the principal
machinery, and passed by constructive annexation.    The
main machinery would not be in working condition without
them, and they are not adapted for general purposes."

*Mr. Lewis,* in his work on *Eminent Domain,* says: "Fix-
tures upon the property taken must be valued and paid for
as part of the real estate, and any depreciation in the value
of fixtures upon the part not taken is to be taken into con-
sideration, the same as damage to the soil itself."    2 *Lewis
on Eminent Domain* (3rd Ed.), sec. 728.    See also *Edmands*
v. *Boston,* 108 Mass. 535; *Allen* v. *Boston,* 137 Mass. 319;
*White* v. *Cincinnati R. & M. R. R.,* 34 Ind. Ap. 287.

In the case of *Matter of the Mayor,* 39 N. Y. App. Div.
589, the city contended that although the machinery as it
stood upon the land would be a fixture as between vendor and
vendee, that rule did not apply in condemnation cases, and
that it was the duty of the owner to remove all machinery
that could be removed without its practical destruction.    In
that case the Court said: "There is practically no dispute
upon the evidence that, as between vendor and vendee, a very
large portion of this machinery should have been regarded
as a fixture, and, therefore, if the premises had been sold by
contract between two individuals the machinery would go
with the land.    Does this law of fixtures apply to this class
of cases?"    After stating the rule in regard to fixtures, as
between vendor and vendee, the Court says further: "The
same rule exists in proceedings to take land under the right
of eminent domain, and the commissioners of estimate have
no right to restrict the assessment to the simple value of the
land, compelling the owner to retain the fixtures on the

premises, and exempting the city from an obligation to take and pay for them as a part .of the land. (*Schuchardt* v. *Mayor,* 53 N. Y. 202, 208.) . Whatever has been put upon the land by the owner with the intention that it should remain upon the land and was essential to the use which he made of it, is, generally speaking, as between himself and his vendee, a fixture, and goes with the land when he shall sell it."

This case. is cited in *Lewis on Eminent Domain, supra,* and in a note in 15 *Cyc.* 759, and was followed in the case of *White* v. *Cincinnati R. & M. R. R., supra,* where the appellate. Court of Indiana held that "in a proceeding to condemn, for a railroad right of way, land on which there are buildings constituting a manufacturing plant,. the machinery therein necessary to carry on the business of the plant, regardless of the manner of its attachment to the freehold, should be considered as part of the freehold, in estimating the damages." In that case the Court said: "The case at bar seems to have been tried upon the theory that a part of this machinery should be considered as part of the land, while a part of the machinery might not be so considered. It is clear from the record that the improvement upon the real estate consists not simply of certain buildings containing various pieces of machinery, but of a paper mill—a thing complete within itself. Such machinery as is necessary and essential to a paper mill plant would be without value except as a part of a paper mill. Means were provided for. utilizing the water power, buildings erected, and machinery placed in position for the purpose of establishing a paper mill. It is not questioned that the buildings should be regarded as a part of the land. In such cases there is no more reason for saying that the machinery necessary and essential for the carrying out the purpose of the mill is a mere incident or accessory to the buildings than there is for saying that the buildings are incident or accessories to the machinery. One machine essential in the manufacture of paper might .be so annexed to

or constitute such part of a building that it could not be removed, and another machine equally essential might be easily removed, and yet, when the two machines. are separated, each is without value for the uses intended. In such case both of the machines should be considered as attached to the freehold-one by real and the other by constructive annexation. As the machinery is permanent in its character, and, being essential to the purpose for which the buildings are used, is a fixture, it must be regarded as realty, and goes with the buildings. The land, water power, buildings and machinery constitute a paper mill plant—a unit."

If the machines and machinery in the cotton duck mill of the appellant are tested by the principles announced in *Dudley* v. *Hurst, supra,* it would seem clear that, as between a vendor and a vendee of the land and mill, they should be regarded as actually or constructively annexed to the buildings or land, and, therefore, as fixtures, and if, in accordance with the doctrines announced in *Lewis on Eminent Domain* and the cases last cited, which seem eminently just and fair, we apply that rule to property taken under condemnation proceedings, it follows that if the City had condemned the land and mill of the appellant it would have been required to take the machinery mentioned in the contract. As the Water Board is authorized by the Act to acquire by condemnation or otherwise "mills, factories and industrial plants," which must be construed to include the machinery in and annexed to mills and we do not think that the contract of the appellant and the Water Board is open to the objection that it includes property which the city is not authorized to acquire under the Act.

It is urged by the appellees that as nearly all of the items of property mentioned in the Act are species of real property, following the maxim *Noscitur a sociis,* the words "Mills, factories and industrial plants" should be interpreted to mean real property, not including movable machinery in mills, factories, etc. And this view, they claim, is strengthened by the requirement that the title of the city shall "be ·

in fee simple." But if we treat this machinery as fixtures, and, therefore, as a part of the land or real property, we are still within the rule of construction referred to.

As a further defense to the demand for specific performance of the alleged contract, the defendants insist in their answers that the amount specified therein is greatly in excess of the real value of the property and that the Water Board was induced to enter into said contract by false representations of material matters made by the appellant or its representatives to the Water Board, or the members thereof, and upon which it relied.

An application for specific performance of a contract is addressed to the sound and reasonable discretion of the Court. This discretion is not an arbitrary one, "but a sound judicial discretion, regulated by fixed and established rules." As said in *Gough* v. *Crane et al.,* 3 Md. Chancery, 134: "In the exercise of a sound and judicial discretion, the Court will not be active in specifically enforcing claims, not under the actual circumstances just between the parties," or as stated in *Geiger et al.* v. *Green,* 4 Gill, 472: "A Court of equity must be satisfied that the contract sought to be enforced is fair and just and reasonable and equal in all its parts, and founded on an adequate consideration, before the Court will interpose with this extraordinary assistance." It is said in *O'Brien* v. *Pentz,* 48 Md. 562: "The interposition of a Court of equity in granting relief by the enforcement of the specific performance of any contract, it is not a matter *ex debito justitiae,* and to warrant its interference, the terms thereof must be fair, and it must be founded on a valuable consideration, and be made under circumstances commending it to the favorable apprehension of the Court," and in *Popplein* v. *Foley,* 61 Md. 381: "While specific execution is a matter not of absolute right in the party, but of sound discretion in the Court, yet if a contract respecting real property is in writing, and is certain, fair in all its parts, for an adequate consideration, and capable of being performed, it is as much a matter of course for a

Court of equity to decree specific performance of it, as it is for a Court of law to give damages for a breach of it." In the light of these rules, let us examine the facts and circumstances connected with the execution of the contract in question, in order to ascertain whether it is entitled to the favorable consideration of a Court of equity

A bill to authorize the improvements mentioned in the Act of 1908 was first introduced in the Legislature in 1906. To that bill Baltimore County and the Warren Manufacturing Company secured certain amendments which they deemed necessary for the protection of their interests, but which were so objectionable to the City that the bill was abandoned. In the fall of 1907 the city officials undertook to adjust these differences between the City and Baltimore County and the Warren Manufacturing Company in advance of the meeting of the Legislature of 1908. The negotiations between the City and the Warren Manufacturing Company, which were conducted mainly by Mr. Quick, president of the Water Board, on behalf of the Water Board, and by counsel for the Warren Company, resulted in the contract contained in the correspondence referred to. The object of the Warren Company was to accomplish the sale of their *entire* property, including all machinery in its mill, at what it claimed was a fair valuation, while the moving purpose of the Water Board in these negotiations was to purchase the property at the most reasonable price possible, in order to avoid the risk of condemnation proceedings, and the imposition upon the City of excessive damages through the adoption of a rule of damages that would be especially burdensome. One of the things feared by the Water Board was a valuation by a jury of the appellant's cotton duck factory as a "going concern" based upon a capitalization of the net profits of its business. One of the important items of property considered was the machinery in the mill. During these negotiations counsel for the Warren Company wrote Mr. Quick, "Mr. Hooper estimates that $42.00 per spindle is about what it would cost to build

and place the machinery of the Warren Mill." "Mr. Hooper's estimate of the machinery is, at $42.00 a spindle, nearly $300,000," and also told Mr. Quick, "That the company earned the previous year net eighty thousand dollars approximately, and for two or three years previous to that between sixty and eighty thousand dollars." These statements made by counsel for the company were based on a statement to him, and statements of the earnings of the Warren Company, made by the officers of the company. But it clearly appears from the evidence that Mr. Hooper never examined the machinery and plant of the Warren Company, and that his estimate of $42.00 a spindle was an estimate of the value of the entire plant, and that the statement of the company during the years mentioned, when corrected so as to show the net profits of the business for those years, do not justify said statement as to the net earnings of the company. Mr. Baldwin, Jr., did have a conversation with Mr. Hooper in regard to the value of the machinery of the Warren Company, in which, Mr. Hooper says, "in a rough off-hand way, I gave him what I thought was approximately the value of the plant, not only the machinery, but the plant. Mr. Hooper states that he had never seen the Warren property, and that he told Mr. Baldwin at the time that he could not place any value on the plant without seeing it. He says further that when he gave him the off-hand estimate of $42.00 a spindle, he had in mind "a steam-driven plant," including the mill buildings. Mr. Baldwin's version of what was said in that conversation fully justifies his statement in his letter to counsel for the Warren Company, and while Mr. Hooper's recollection is not very clear as to all that was said it is very evident that he did not intend the "off-hand" estimate made by him to be treated as a final estimate of the value of the machinery, for in his letter to Mr. Baldwin, Jr., dated December 19th, 1908, he says:

"DEAR SIR:

In the testimony before the Warren investigating committee at its last session I notice I am again quoted

as having given you a valuation of some $300,000 on the machinery in their mill.

You will remember that I promptly disclaimed such testimony upon its first appearance, and I now wish to emphasize the fact that I never gave you any formal estimate of the value of your property. I met you at the Merchants' Club about a year ago and you asked me what it would cost to build and equip a mill of the "Warren" class, and I told you offhand about $42.00 per spindle, which included mill building, machinery and steam power plant. I later, at your request, visited the plant for the purpose of forming an estimate of its present value, but owing to your failure to furnish an inventory of the equipment I neither furnished you a report nor made any estimate beyond the casual one named in the first instance."

The letter of counsel for the Warren Company to Mr. Quick, which was based on a report of the conversation with Mr. Hooper to which we have referred, and in which he stated that Mr. Hooper's estimate of the machinery, at $42.00 a spindle, was nearly $300,000, does not state that the mill building was included in that estimate, and we think that Mr. Quick was justified in concluding from that letter that the estimate had reference to the machinery alone, and that he did so understand the letter is clearly shown by his testimony and his letter to Mr. Bruce.

The statement of counsel for Warren Company as to the net earnings of the company for the year 1907 and for two or three years prior thereto was based on the following statements made by an officer of the company:

*Statement of Warren Mfg. Co., 12 Months Ending
December 31, 1905.*

ASSETS.

| | |
|---|---:|
| Amount due by Woodward, Baldwin & Co. | $32,793.12 |
| Stock manufactured goods | 1,764.77 |
| Cotton on hand (302 bales) and in process | 33,662.88 |
| Mill supplies | 2,924.75 |
| Coal and wood | 307.50 |
| Farm, horses, wagons, machinery, etc. | 1,000.00 |
| Open accounts | 114.77 |
| Cash at mill | 77.69 |
| Cash in bank | 293.31 |
| | $72,938.80 |

LIABILITIES.

| | | |
|---|---:|---:|
| Amt. due National Ex. Bank | $20,000.00 | |
| Pay roll | 3,510.44 | |
| Unpaid bills | 2,217.51 | |
| | | 25,727.95 |

| | |
|---|---:|
| Present surplus | $47,210.85 |
| Surplus, Dec. 31, 1904 | 41,226.30 |
| Increase in surplus past 12 months | $5,984.55 |

Dividens paid:

| | | |
|---|---:|---:|
| January 24, 1905 | $4,000.00 | |
| July 25, 1905 | 4,000.00 | |
| | $8,000.00 | |

New machinery, improvements and betterments:

| | | |
|---|---:|---:|
| Expended 6 mos. to June 30 | $20,371.68 | |
| Expended 6 mos. to Dec. 31 | 17,698.00 | |
| | 38,069.68 | |
| | | 46,069.68 |
| | | $52,054.23 |

| | |
|---|---:|
| Less received from insurance companies account fire farm barrack | 1,050.00 |
| Profit, 12 months | $51,004.23 |

*Statement of Warren Mfg. Co., 12 Months Ending*
*December 31, 1906.*

### ASSETS.

| | |
|---|---:|
| Woodward, Baldwin and Co., amount due......| $54,095.46 |
| Stock manufactured goods (964 lbs. duck, 17½c.; 1795 lbs. yarn, 16c.)............... | 455.90 |
| Cotton on hand (258 lbs., 126803 lbs. at 10.78). | 13,669.36 |
| Cotton in process (116983 lbs.).............. | 15,508.44 |
| Mill supplies................................ | 4,129.20 |
| Coal and wood............................. | 629.47 |
| Farm implements and supplies.............. | 1,000.00 |
| Open accounts.............................. | 929.98 |
| Cash in bank............................... | 24.46 |
| Cash at mill............................... | 135.37 |
| | $90,579.64 |

### LIABILITIES.

| | | |
|---|---:|---:|
| Pay roll.........................$1,920.92 | | |
| Unpaid bills...................... 667.23 | | |
| | | 2,588.15 |
| | | |
| Present surplus............................ | | $87,991.49 |
| Surplus, December 31, 1906................. | | 47,210.85 |
| | | |
| Increase in surplus, 12 months............. | | $40,780.64 |
| Dividends paid...................$14,400.00 | | |
| New machinery & improvements.... 10,354.92 | | |
| Purchase of blacksmith shop and grounds...................... 568.70 | | |
| Paid on acct. road improvement.... 516.31 | | |
| | | 25,839.93 |
| | | |
| Profit, 12 months........................ | | $66,620.57 |

*Statement of Warren Mfg. Co.,* 12 *Months Ending*
*December* 31, 1907.

ASSETS.

| | |
|---|---:|
| Woodward, Baldwin & Co., amount due | $97,550.08 |
| Stock mfg. goods | 7,776.13 |
| Cotton on hand and in process | 23,903.60 |
| Mill supplies | 3,793.69 |
| Coal and wood | 599.56 |
| Farm implements and supplies | 1,000.00 |
| Open account | 783.99 |
| Cash in bank | 407.32 |
| Cash at mill | 57.60 |
| Unexpired insurance | 1,296.42 |
| | $137,168.39 |

LIABILITIES.

| | | |
|---|---:|---:|
| Unpaid bills | $942.70 | |
| Pay roll | 2,121.06 | |
| | | 3,063.76 |

| | | |
|---|---:|---:|
| Present surplus | | $134,104.63 |
| Surplus, December 31, 1906 | | 87,991.49 |

| | | |
|---|---:|---:|
| Increase in surplus, past 12 mos. | | $46,113.14 |
| Dividends paid | $25,600.00 | |
| Improvements | 3,607.63 | |
| Extraordinary expenses | 10,400.00 | |
| | | 39,607.63 |

| | |
|---|---:|
| Profit for 12 months | $85,720.77 |

In all these statements, in ascertaining the profits for the
year, there is added to the increase in surplus the amount
expended for machinery and improvement. For instance, in
the statement for the year 1905 there is added $38,069.68
for machinery, improvements, etc., and in the statement for
the year 1906, $10,345.92, and for the year 1907, $3,607.63.
The evidence shows that some of the machinery included in
these items was purchased to take the place of old and dis-

carded machinery, and no allowance is made in the accounts for depreciation of machinery or other property. There is evidence tending to show that at least ten per cent. of the value of the machinery should be allowed for depreciation, but apart from that it is quite evident that if this machinery took the place of old machinery, and was required in order to maintain the proper efficiency of the plant, it should not be regarded as betterments, in estimating the net profits of the business. Mr. Britton, the superintendent of the company, testified that the new looms purchased in 1905 and in 1906, took the place of the old ones, which were disposed of by the company as scrap, and the evidence shows that in 1905 the amount expended for looms was about $12,603.74, and in 1906, $3,522.20.

In the statement for 1907 we find added for improvements $3,607.63 and for "extraordinary expenses" $10,400.00; $1,096.21 of the $3,607.63 was expended for machinery. Of the $10,400.00, $9,600. was for eight years' salary for the president and $800.00 was for counsel fees.

That the salaries of officers and counsel fees should be charged in the expense account, and deducted from the earnings in ascertaining the net profits, would seem to admit of little doubt.

We also think that in the statements referred to, where the cost of machinery is added to the surplus of the previous year in ascertaining the profits of a year's operations, there should be some deduction for the depreciation of the machinery, and that, allowing for such deductions, a statement that the net earnings of the company for the year 1907 was $80,-000.00, and for two or three years previous from $60,000.00 to $80,000.00, would be misleading.

Plaintiff's witnesses, Mr. Whitmam and Mr. Allen, valued the water power of the company's plant at $287,950.00, the buildings at $189,250.00, the land at $42,100.00, and machinery $245,415.00, making a total of $764,715.00. The evidence shows that while these witnesses were familiar with the cost of machinery of the kind used in the Warren Mill,

and with the method of ascertaining the value of water power as compared with the cost of steam power, they had very little knowledge of the market value of land or the value of such plants in Maryland. Witnesses for the defendants, who based their estimates upon sales of similar properties or plants in this State, and upon the market value of land in the neighborhood of the Warren mill, and the reports of the officers of the company made for the purpose of furnishing a basis of taxation, place a very much lower valuation upon the company's property. Without undertaking to determine upon this evidence what the value of the property was at the time the contract in question was made, we can not escape the conclusion that the sum named in the contract is in excess of what should have been regarded as its market value.

In determining how far the misrepresentations referred to, and the fact that the sum named in the contract was in excess of the market value of the property, should influence a court of equity, certain well settled principles must be adhered to. This Court has repeatedly announced the rule that "A Court of Equity does not affect to weigh the actual value, nor to insist upon the equivalent in contracts, where each party has equal capacity" (*Young* v. *Frost,* 5 Gill, 315), and in the case of *Lawson* v. *Mullinix,* 104 Md. 168, the Court quotes the statement in *Shepherd* v. *Bevin et al.,* 9 Gill, 32: "None of them (referring to cases cited by counsel for the appellee), assert that inadequacy of price alone, unattended by fraud or circumstances of suspicion, was ever declared sufficient ground to avoid a contract in other respects regular. On the contrary, the parties have a right to make their own contracts, and the mere inadequacy of price is no ground of objection, where the contract is fair and voluntary." As to the affect of misrepresentations that are material and relied upon, the authorities seem equally clear. In *Fry on Specif. Perf.* (5th Ed.), the author says, on page 525: "A misrepresentation, whether fraudulent or innocent, having relation to the contract, made by one of the parties to

the other of them is a ground for refusing the interference of the. Court in specific performance at the instance of the former party"; and, on page 335: "It is not, of course, necessary that the statements which were false should have been the sole inducements to the contract." The same author, on page 334, after referring to the case of *Redgrave* v. *Hurd,* 20 L. R. Ch. Div. 1, in which it was said that if the representation made to a party to a contract is a material representation, "it is an inference of law that he was induced by the representation to enter into it," says: "This is probably an erroneous statement; but the law probably justifies this view that if the representation be of the kind likely to be influential on the mind, the Court will so hold it, on very slight evidence, unless the contrary be satisfactorily shown by evidence or admission." Except as to the degree of proof necessary to show that the representations were relied upon, the same rule is stated in *Pomeroy on Specif. Perf.* (2nd Ed.) secs. 209-218. The Court said in the case of *Gurley* v. *Hiteshue,* 5 Gill, 223: "A Court of Equity, professing as it does to lend its aid exclusively to cases in which a claim can be conscientiously enforced, will never coerce the specific performance of a contract for a party who has not acted fairly, openly and without suppression of any important fact, or the expression of any falsehood. Whether with a fraudulent design or innocently, yet if a false impression has been conveyed and made the basis of the contract, this extraordinary jurisdiction of the Court will not be exercised by coercing a specific performance." And in the case of *Crane* v. *Judik,* 86 Md. 63, JUDGE RUSSEUM said: "In making the sale of a ground rent of one hundred and forty dollars, under the circumstances of this case, whether fraudulently or innocently, a false impression was conveyed and made the basis of the contract, and the extraordinary jurisdiction of the Court of Equity ought not to be exercised by coercing a specific performance."

The rule fairly deducible from these authorities, and many others that might be cited to the same effect, is that while inadequacy of consideration is not alone a sufficient ground upon which to refuse specific performance of a contract, it may be taken into consideration with other facts in determining the right to such relief, and that where it is shown that one of the parties to the contract made representations, either fraudulently or innocently, as to material matters, which were false, and which were relied upon by, or which influenced the other party, in entering into the contract, a Court will not grant specific performance. In other words, unless the Court can see that the contract is in all respects fair it will not aid in its enforcement.

That the misrepresentations to which we have referred were material, and that Mr. Quick, the president of the Water Board, who conducted negotiations on behalf of the city, was influenced by them, is shown by his letter to Mr. Bruce of January 23, 1908, in which after stating that he had offered the company $600,000.00 and that the company's estimate of the value of the property was between $875,000 to $1,200,000 but that counsel for the company had suggested that the company might probably accept a sum between $725,000 and $800,000, he says, in regard to the machinery, and in explanation of his offer, that counsel for the company "presented two estimates, one made by Mr. Hooper of $280,000, and the other made by the company's superintendent of $250,000. The only way in which we could determine whether these estimates are fair or not would be by getting an expert to make a valuation. In order to save the time and expense that would involve I simply took the superintendent's estimate of $250,000 and cut off $50,000 from it for depreciation, which I understand he did not allow." The letter, after explaining the difficulty of estimating the value of the water power, then contains this inquiry. "If it does not materially increase that estimate, do you believe that there are other considerations sufficiently important to justify us in increasing our offer to some amount within the

limits of from $725,000 to $800,000 which, 'counsel for the company suggested might be accepted,' such considerations as the fact that if we do not agree on a price now the company may be delaying condemnation proceedings accumulate more net earnings from operations at the rate of about $80,-000.00 a year, or that if the property should be valued as a going concern on the basis of present not earnings, at any rate from 7 per cent. down to 4 per cent., the valuation would be over $1,000,000.00 or the extra cost to us, if we have to go through condemnation proceedings."

In reply to this letter Mr. Bruce stated that, after arriving as nearly as he could at the elements of valuation that were more or less susceptible of precise determination, he should undoubtedly take into account the fact, that if he did not reach an agreement with the company the Legislature might impose upon the city the special rule of damages for which the company had been striving, and that a jury would probably place the highest valuation upon the property. After this letter was received Mr. Quick made an estimate of the water power; and secured from Mr. Yellott an estimate of the value of the land, from Mr. Preston an estimate of the value of the improvements, and from Mr. Thomas an estimate of the value of the machinery, and these estimates amounted to $581,000.00 for the entire property. The difference between this estimate and the amount mentioned in the contract is $144,000.00 and in making the offer of $725,-000.00 which, even after deducting the rent mentioned in the agreement, was in excess of the estimate of its experts, the Water Board must have been moved by the fear of condemnation proceedings, and that fear was undoubtedly increased by the statement that Mr. Hooper, who had recently built a cotton duck mill at Woodberry, had valued the machinery at nearly $300,000.00 and the statement that the net earnings of the company was $80,000.00 for the year 1907, and from $60,000.00 to $80,000.00 for two or three years previous, and the probable effect of such evidence upon a jury.

Mr. Quick testified that the statement that Mr. Hooper has estimated the value of the machinery at nearly $300,000 undoubtedly had some effect on his estimate of its value, but apart from this testimony we think that the evidence shows that he and the Water Board in agreeing upon the price named in the contract, were influenced by these misrepresentations, to such an extent that, in view of the fact that the amount named is in excess of the market value of the property the contract cannot be said to be in all respects fair and just.

We are not to be understood as saying that the counsel for the company or an officer of the company was guilty of fraud or of making wilful misrepresentations. We do not understand the pleadings as making such a charge, and there is no evidence in this case to warrant such an imputation. Misrepresentations as to material matters, though innocently made, if relied upon to the extent of making the contract unconscionable, will disentitle the party making them to the aid of a Court of equity to enforce it.

Nor is there any suggestion in the record of any fraudulent or corrupt arrangement between the Warren Company and the Water Board. The contract was not published in the newspapers or generally known of until after the loan was ratified at the general election in 1908, but it is not intimated either in the pleadings or evidence that that was due to any irregularity in the conception of the contract. The only explanation found in the record is the request of the Warren Company that the agreement "should not be given any publicity". The reason assigned for making this request was that the company would have "great difficulty" in retaining its employees after it was generally known that the company would not continue its business.

The only remaining question necessary to be considered relates to the right of the appellant to an injunction restraining the erection of the proposed dam on the Gunpowder river.

The evidence shows that it is the purpose of the Water Board to so construct the dam as not to injure or interfere with the property of the Warren Company.

Mr. Whitman, the Water Engineer of the City, says it has not been determined to what height the proposed dam is to be built, that it will take at least a year and probably eighteen months before the dam can be built to the height of 186 feet, and that will give him ample opportunity to determine with certainty to what height the dam may be erected without in any way injuring the property of the appellant or interferring with its use, and that when that is determined he will in pursuance of the resolution of the Water Board, stop the construction of the dam at that elevation. The specifications indicate that the dam is to be built to the height of 186 feet, with movable flash boards erected on the crest of the dam by which the elevation may be increased. The plans also include sluice gates, located below the crest of the dam. These flash boards and sluice gates are to be so constructed that the flash boards may be raised and the gates opened during a flood, and Mr. Whitman states that the sluice gates are large enough to carry off any flood such as usually occurs about once a year. The proposed dam is to be located about 2,100 feet above the present dam at Loch Raven, and about seven miles below Merryman's dam, on the property now owned by the City, and about eight miles below the Warren Company's mill. The elevation of the present dam is 171.2 feet, the elevation at Merryman's dam is 194.14, the elevation at the lower boundary of the Warren property is 195 feet, and the elevation of the tail race of the Warren mill is 195.85 feet. With the proposed dam at an elevation of 186 feet the lake would extend up the river to a point some distance below Merryman's dam, and with the dam at 192 feet the lake would reach a point about 250 feet below Merryman's dam. The valley of the river above the Warren Company's property is quite wide, but on the Warren property the river flows through what is termed a narrow gorge.

The evidence of the experts produced by the company is to the effect that the erection of the dam to an elevation of 186 feet or 192 feet will during ordinary floods seriously damage the plaintiff's property by forcing the water back on the property and causing it to rise at the Warren mill. They state that the water flowing through the Warren property, when it strikes the *"dead level"* of the lake will be forced back until it is raised high enough on the Warren property to have sufficient force to move the water in the lake. On the other hand, the experts produced by the City state with equal positiveness, that as the level of the water in the lake to be formed by the proposed dam is below the level of the Warren property, the erection of the dam to an elevation of 186 feet, or to an elevation of 186 feet with movable flash boards, increasing that elevation to 192 feet, would have no practical effect upon the Warren property. They say further that the flow of a river can only be determined by taking cross sections of the stream, and calculating the flow by the use of Kutter's formula and other formulas well known to hydraulic engineers, which method was not employed by plaintiff's experts.

It is not easy, of course, for a Court to determine with any measure of accuracy the relative weight of such testimony, but in this case the Court if greatly aided by the record of floods that have occurred in the valley of this river. The evidence shows that in 1889, during the Johnstown flood, the water rose to the height of fourteen feet above its normal elevation at the tail race of the Warren mill, and flowed over the dam at Loch Raven to the height of about eight feet above the dam. The difference, therefore, between the elevation of the water at the tail race of th Warren mill and the water at Loch Raven during that flood was about thirty feet. The height of the water at the Warren mill during that flood must undoubtedly have been due in large measure to the fact, that the water in the wide valley above the Warren property was forcing the water through the narrow gorge on the Warren property. All of

the experts agree that such a flood would not rise to the same height over the proposed dam, but assuming that it would, the water at the Warren mill would still have a fall of fifteen feet if the dam was 186 feet, and a fall of nine feet if the dam was 192 feet. Mr. Whitman, Water Engineer of the City, who testified as an expert, says that where during a flood the water enters a gorge it has to pile up, increase its depth, surface slope and velocity in order to pass through the gorge. The same amount of water cannot pass through the narrow gorge until it piles up and increases its velocity, which shows that the gorge itself, irrespective of the fall below the mouth of the gorge, has the effect of piling the water up in the gorge, and that as long as the fall is such that the water does not back up to the extent of occupying any portion of the mouth of the gorge, the amount of the fall from the gorge has practically no effect upon the depth of the water in the gorge. To this view, which seems to be a reasonable one, Mr. Allen, the plaintiff's expert, agrees, and if it is sound is apparently no reason why the erection of the dam to an elevation of 186 feet should endanger the property of the appellant, as the difference between that elevation and the elevation of the lower boundary of the Warren property is about nine feet, and any increase in the elevation of the water in the lake during a flood will be met by a corresponding increase in the height of the water at the Warren property. The evidence shows that the water in the proposed lake, with the dam at an elevation of 186 feet, does not reach the property of the Warren Company, nor would it do so if the height of the water was increased eight feet. The flooding of the plaintiff's property during such a flood as we have mentioned could not, therefore, be attributed to the erection of the proposed dam at an elevation of 186 feet.

That the erection of a *solid* dam to the height of 192 feet would not endanger the appellant's property is not so apparent. The appellant's experts say it would, while the defendant's experts assert that it would not. But the specifications

and evidence show that the solid dam is to be built to an elevation of 186 feet, with movable flash boards by which that elevation may be increased to the height of 192 feet, and with sluice gates sufficient to discharge the water during any ordinary flood.   There is some evidence to the effect that the opening of the sluice gates and the raising of the flash boards will be attended with some difficulty during a flood, and that they are liable to be neglected, but some uncertainty is incident to the employment of all human agencies and mechanical appliances.  The evidence shows that it would take an hour or two during a flood for the water to raise a foot at the dam, and Mr. Whitman, plaintiff's expert, says, that will give those in charge of the dam ample time in which to raise the flash boards and open the sluice gates. With the flash boards raised, the proposed dam would have no more effect upon plaintiff's property than a solid dam at an elevation of 186 feet without flash boards.

As we have said, a dam at an elevation of 186 feet could not in any way damage plaintiff's property, or affect the flow of the stream through its land, and we do not think there is any apparent danger of damage to its property, or of interference with its rights, from a dam erected according to the specifications with sluice gates, and movable flash boards raising the dam to the height of 192 feet, to be opened and raised in advance of an approaching flood.

If, as the erection of said dam progresses, the danger of damage or of interference with its rights becomes apparent, the plaintiff may renew its application for an injunction. But until such danger can be made to appear, the plaintiff is not entitled to an injunction restraining the construction of an improvement so important to the City.

In *High on Injunctions* (4th Ed.), sec. 743, it is said: "Where an injunction is asked to restrain the construction of words of such a nature that it is impossible for the Court to know, until they are completed and in operation, whether they will or will not constitute a nuisance, the writ will be refused in the first instance.  It is proper, however, under such circumstances to dismiss the bill without prejudice to any further application which the plaintiffs may think them-

selves entitled to make." And in section 844 the author says: "When it is sought to restrain the construction of a dam over a navigable river upon the ground that it will obstruct navigation, the work being in the nature of a public improvement authorized by an Act of Legislature, equity will not enjoin its construction merely upon theoretical opinions as to the injury. In the case of *Adams* v. *Michael,* 38 Md. 123, JUDGE ALVEY said: "The general rule is, that an injunction would only be granted to restrain an actual existing nuisance; but where it can be plainly seen that acts which, when completed will certainly constitute or result in a grievous nuisance, or where a party threatens, or begins to do, or insist upon his right to do certain acts, the Court will interfere, though no nuisance may have been actually committed, if the circumstances of the case enable the Court to form an opinion as to the illegality of the acts complained of, and the irreparable injury which will ensue. *Dawson* v. *Paver,* 5 Hare, 430; *Elwell* v. *Crowther,* 31 Beav. 169; *Palmer* v. *Paul,* 2 L. J. Ch. 154; *Kerr on Inj.* 339. The Court, however, must in all such cases, at the time the motion is made, be enabled either to form its own opinion, from the circumstances of the case, as to the legality of the meditated purpose of the defendant, or to put that question in a course of immediate trial, and where that cannot be done, the motion for the injunction will not be allowed to stand over till the purpose of the defendant has been so far executed as that its character may be judged of, but the application will be at once refused, though without prejudice to any future application. *Haines* v. *Taylor,* 2 Phillipps' Chancery, 209.

Counsel for the appellant rely upon the case of *Baltimore* v. *Appold,* 42 Md. 442, where JUDGE ROBINSON said: "The right of every reparian owner to the enjoyment of a stream of running water in its natural state, in flow, quantity and quality, is too well established to require the citation of authorities. It is a right incident and appurtenant to the ownership of the land itself, and being a *common right* it follows that every proprietor is bound so to use *the common right* as not to interfere with an *equally beneficial enjoyment*

of it by others. This is the necessary result of the equality of right among all the proprietors of that which is common to all. As such owner, he has the right to insist that the stream shall continue to run *uti currere solebat,* that it shall continue to flow through his land in its usual quantity, at its natural place and at its usual height. Without a grant, either express or implied, no proprietor has the right to obstruct, diminish or accelerate the impelling force of ·a stream of running water. Of course, we are not to be understood as meaning there can be no diminution or increase of the flow whatever, for that would be to deny any valuable use of it. There may be, and there must be allowed to all of that which is common, *a reasonable use,* and such a use, although it may, to some extent, diminish the quantity, or affect, in a measure, the flow of the stream, is perfectly consistent with the common rights."

But in the case at bar the evidence shows that the erection of a dam to an elevation of 186 feet would not damage the appellant's property, or interfere with any of the rights mentioned by JUDGE ROBINSON, and the plaintiff has failed to show that the erection of the proposed dam according to the specifications to an elevation of 186 feet, with movable flash boards, raising the dam *to* 192 *feet, to be moved in advance of a flood,* will damage its property or interfere with any of its said rights.

We think plaintiff's exceptions to the evidence, so far as they relate to the evidence to which we have referred, were properly overruled.

Other interesting questions have been discussed in the oral arguments and the able and elaborate briefs of the counsel, and were disposed of by the learned Court below in a carefully prepared opinion. But as it is not necessary to decide them in this case, and as a thorough examination and discussion of them would greatly extend this opinion, their importance suggests the propriety of postponing a consideration of them by this Court until it is required for the proper disposition of the case in which they arise.

For the reasons we have stated, we must affirm the decree from which this appeal was taken.

*Decree affirmed, with costs.*