# MT. VERNON-WOODBERRY COTTON DUCK COMPANY

*vs.*

# CONTINENTAL TRUST COMPANY OF BALTIMORE, Trustee; THE BALTIMORE TRUST COMPANY, Trustee, and HENRY WILLIAMS, LEMUEL T. APPOLD and J. HENRY FERGUSON, Committee of Certain Bondholder.

*Corporations*: *deeds of trust to secure bonds; misapplication of funds; waste; jurisdiction of equity.*

A manufacturing company executed a mortgage conveying all its mill property, machinery and real estate, etc., to trustees, to secure its bondholders; the mortgage provided that the machinery, tools, equipment, etc., conveyed, or intended to be thereby conveyed, should be real estate for all intents and purposes thereof, and should be used and sold therewith, and not separated therefrom, except as therein provided; the mortgage made provision for releases of such real estate and leasehold property as might no longer be necessary or expedient to retain, no such property to be released, however, unless sold, or contracted to be sold or exchanged, and provided that all proceeds from such sales, etc., be set apart and held in trust for the purchase of other property, or in betterment of, or in addition to the mortgaged premises; new property acquired in exchange for any property so released, *ipso facto*, to become and be covered by the lien of the mortgage. The mortgage also provided that the company might from time to time dispose of any part

of its machinery, equipment, etc., which might become obsolete, etc., to be replaced by other machinery, which should be subject to the lien of the mortgage. The mortgage contained a provision requiring the company to keep the mills and machinery in repair. The company dismantled and sold certain mills, receiving in payment therefor a note for $300,000, which it deposited with the trustee. Subsequently the corporation sold certain other machinery in another mill, and acquired new machinery under a leasing agreement, by which the title to the new machinery should remain in the vendors until all payments had been made. The company filed a bill to compel the trustee to apply the note to the account of the new machinery so acquired; on appeal the order of the lower Court denying such petition was affirmed. p. 172

A court of equity will always actively interfere for the purpose of preventing waste of the corpus of a trust estate. p. 171

*Decided June 25th, 1913.*

Appeal from the Circuit Court of Baltimore City (BOND, J.).

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, PATTISON and STOCKBRIDGE, JJ.

*C. Baker Clotworthy* and *J. Southgate Lemmon* (with whom was *Louis Marshall,* on the brief), for the appellant.

*Charles M. Howard* (with whom was *William L. Marbury,* on the brief), for Henry Williams *et als.,* Committee of Bondholders, appellee.

*Nicholas P. Bond,* for the Continental Trust Company, appellee.

*Charles Markell* (with a brief by *Gans & Haman*), for the Baltimore Trust Company, appellee.

STOCKBRIDGE, J., delivered the opinion of the Court.

The Mt. Vernon Woodberry Cotton Duck Company was incorporated in the month of June, 1899, with a capital stock of $9,500,000.

On the 30th August, in the same year, it executed two mortgages, one to secure an issue of first mortgage 5 per cent. bonds of $8,000,000, and the other to secure an issue of first income bonds of $6,000,000. It thus began business with an aggregate capitalization of $23,500,000, of which $1,000 apparently was cash. The balance of the stock, and possibly some of the bonds were held to acquire certain cotton mills located in Maryland, Connecticut, Alabama and South Carolina, in most cases by means of securing all or the majority of the capital stock of the companies theretofore operating such mills. In some manner, just how or for what consideration is not clear, substantially all of the stock and income bonds of a face value of $5,776,000 out of the total of $6,000,000, passed into the hands of the Consolidated Cotton Duck Company, and this latter corporation in turn was under the control of the International Cotton Mills through the ownership of a majority of the stock. The property included in the two mortgages of August 30th was 237 acres occupied by the plant of the Laurel Mills, 115 acres occupied by the plant of the Franklinville Mills, and large amounts of the capital stock of the corporations owning the other mills controlled through such stock ownership by the Mt. Vernon-Woodberry Company.

Among the provisions contained in the mortgage was the following in Article IV, Section 9:

"The machinery, tools, furniture, equipment, supplies and other like chattels conveyed, or intended to be conveyed by or pursuant to this indenture, shall be real estate for all the purposes of this indenture, and shall be held and taken to be fixtures and appurtenances of the said mill properties in or about which they are in use or intended for use respectively and

part thereof, and are to be used and sold therewith and
not separate therefrom, except as herein otherwise
provided."

Notwithstanding this definite, positive provision in the
mortgage, in or about the year 1903 the Greenwoods Mill, in
Connecticut, was completely dismantled and all the machin-
ery taken out, a portion of it was shipped to Tallassee to help
supply a mill that was new and had never been fully
equipped, and what was done with the balance does not
appear from the record. Thereafter the Greenwoods Mill
lay idle till December, 1911, when it was sold for $300,000
to a corporation known as the Draycott Mills, the trustees
releasing the mortgages in compliance with a provision of
the mortgages, which will be alluded to later, and the prom-
issory note given for the purchase money was turned over to
the trustees.

In the summer before this sale was consummated, those
engaged in the management of the Mt. Vernon-Woodberry
Company's properties, finding that a number of the mills
were standing idle, and the others not being operated at a
profit, and as the result of a careful examination of the con-
ditions, came to the conclusion that an important and the
most important cause lay in the fact that much of the ma-
chinery in use, was defective as the result of long years of
use, or unadapted for economical production in comparison
with more modern machinery, such as was in use by their
competitors, and that this worn or old fashioned machinery
must be replaced with adequate, up-to-date machinery. Ac-
cordingly an arrangement was made between the Mt. Vernon-
Woodberry Company and the Consolidated Cotton Duck
Company by which the latter was to purchase the desired
machinery, have it installed in the Mt. Vernon-Woodberry
Company Mills, upon a rental basis of six per cent. interest
upon cost plus a proper allowance for depreciation, and with
the right to the Mt. Vernon-Woodberry Company to pur-
chase it, and a correlative right in the Consolidated Com-

pany to remove, if the conditions of the agreement were not complied with. Just what was the total value of the machinery so purchased and installed does not clearly appear, but it is apparent that some and probably a considerable portion of it had been installed before the sale of the Greenwoods Mill had been consummated, as the final approval of the arrangement by the directors of the Mt. Vernon-Woodberry Company on February 26th, 1912, deals with it as an accomplished fact. None of this new machinery was paid for either in whole or in part, but was all included under the rental or conditional sale agreement, and all of it was tagged as the property of the Consolidated Cotton Duck Company.

After the consummation of the sale of the Greenwoods Mill, the Mt. Vernon-Woodberry Company applied to the trustees under the two mortgages to have turned over to it the $300,000 note of the Draycott Mills, in order that it might in turn pass the same to the Consolidated Company in payment to that extent for the machinery installed in certain mills to take the place of that which had become worn out or obsolete. This request was refused, and thereupon the present bill was filed to require the trustees to comply with this demand. In both the oral argument and the briefs filed the greatest stress was placed upon the question whether the new machinery did or did not upon installation become fixtures, so that the lien of the mortgages attached ahead of any claim of the lessor or conditional vendor, or whether it was covered or could be covered by the after-acquired property clause of the mortgages, without additional, independent conveyances thereof.

These are questions upon which there is a wide diversity of decision in the various Courts, and any attempt to harmonize the various decisions would be absolutely futile. The doctrine in this State will be found clearly laid down in such cases as *Dudley* v. *Hurst,* 67 Md. 44; *Central Trust Co.* v. *Arctic Ice Company,* 77 Md. 202, and *Warren Mfg. Co.* v. *M. & C. C. of Balto.,* 119 Md. 188.

The Circuit Court of Baltimore City, in which this case was tried, did not deem the determination of that question as the controlling factor in this case, nor does this Court. The rights of the mortgagor company and the duties of the trustees are alike dependent upon the provisions contained in the mortgages. These are to be found in Sections 1 and 2 of Article 7 of the mortgages, and are as follows:

"Section 1. Upon the written request of the mortgagor Company, approved by resolution of its board of directors or executive committee, the Trustee, from time to time, while the mortgagor company is in possession of the mortgaged premises, but subject to the conditions and limitations in this section prescribed, and not otherwise, shall release from the lien and operation of this indenture any real estate or leasehold, part of the mortgaged premises then subject thereto, provided, that no part of the mortgaged real estate or leasehold property shall be released thereunder, unless at the time of such release it shall no longer be necessary or expedient to retain the same for use in the business of the Mortgagor Company.

"No such release shall be made unless the Mortgagor Company shall have sold, or shall have contracted to exchange for other property, or to sell, lease or otherwise dispose of the property so to be released; and the proceeds of any and all such sales, and all money received as compensation for any property subject to this indenture taken by exercise of the power of eminent domain, shall be set apart and held in trust and applied to the purchase of other property, real or personal, or in betterments of, or additions to the mortgaged premises. Any new property acquired by the Mortgagor Company by exchange for, or to take the place of any property released hereunder, *ipso facto,* shall become and be subject to the lien of this indenture as if specifically mortgaged or pledged thereby; but if requested by the said Trustee, the Mortgagor Company will convey the same to the Trustee,

by appropriate deeds, upon the trusts and for the purposes of this indenture.

"Section 2. The Mortgagor Company, while in possession of the mortgaged premises, shall also have full power, in its discretion, from time to time, to dispose of any portion of the machinery, equipment, furniture and implements at any time held subject to the lien hereof, which may have become obsolete or otherwise unfit for such use, replacing the same by new machinery, equipment, furniture or implements, which shall become subject to this indenture; and shall also have full power from time to time to dispose of any manufactured goods or raw material held subject to the lien hereof, replacing the goods or material so disposed of with other goods or material of the same kind or quantity, or of equal value, which shall forthwith become subject to this indenture."

Before considering the effect of these provisions, mention must be made of two other facts. The mortgages are peculiar in that they do not contain any express covenant on the part of the mortgagor to keep its property in repair, and there is therefore no positive obligation upon the Mt. Vernon-Woodberry Company to keep up by proper care and repair any machinery which may be in any of its mills. The second fact has to do with the replacement or substitution of the new machinery for that discarded. When the old machinery was taken out it was apparently disposed of as junk, but even disposed of in this manner must have produced something, but that which was realized from its sale as junk was not applied on the purchase of the new machinery, but remains unaccounted for. It may have been added to the thousand dollars cash with which the company started to do business. It also appears that the schedules presented, upon which the demand for the $300,000 was based, were not schedules of the machinery purchased or leased, but, as was testified by Mr. Taylor, were schedules "gotten up to make a sum adequate to cover" the amount for which the

Greenwoods Mill was sold. These facts while in some sense insignificant, throw a great deal of light upon the methods of the financial management of the company.

It remains to consider the two sections of Article 7 of the mortgage, already quoted. These provide specifically for two entirely separate and distinct matters. The first provides the method by which real or leasehold property belonging to the company and subject to the mortgage, may be sold and released from the effect and operation of the mortgage, by joint action of the mortgagor and trustee, and for the disposition of any moneys realized from any such sale or sales. The second deals with the maintenance of the plant by providing for the disposition by the company, without the intervention of the trustee, of machinery, equipment or implements, which may have become absolete or unfit for use, and the replacement of "the same by new machinery, equipment" or implements, which shall then become subject to the mortgage; and also for the sale of the manufactured products of the company. What was done by the company in disposing of the old machinery and replacing with new, therefore, came exactly within the terms of Section 2. But it is urged on behalf of the appellant that inasmuch as it is provided by Section 1 that the proceeds derived from the sale of real or leasehold property may be "applied to the purchase of other property, real or personal, or in betterments of or additions to the mortgaged premises," the use of the $300,-000 purchase money of Greenwoods Mill is authorized to be applied to the payment for the replaced machinery as a betterment of or addition to the mortgaged property. With that contention this Court can not agree. This section expressly provides that the moneys so derived *"shall be set apart and held in trust,"* and applied to the purchase of other property. If language means anything this can only mean that inasmuch as the sale of any real or leasehold property covered by the mortgage is a diminution, *pro tanto,* of the security pledged for the mortgage debt, and that the

*cestui que trustent,* the bondholders, are entitled to have the money so applied as to restore the security which they had before any sale had taken place. This is not accomplished by expending the money for that, the use of which must involve its deterioration, if not its consumption, made all the more apparent by the omission from the mortgage of any covenant to repair or keep in repair. This is a familiar rule in the administration of trust funds, one of almost daily application, and no reason has been suggested why it is any the less applicable where a corporation mortgage for a large amount is involved than when dealing with the ordinary trust, when an attempt is made for some supposed pressing need to encroach on the corpus of the estate. No duty on the part of a trustee is better known than the prevention of waste of the corpus of the trust estate. A Court of equity never hesitates to actively interpose, if need be, for this purpose. In this respect the contention of the appellant is that the real value of the security for the bondholders lies, not in any particular piece or pieces of property, but in the maintenance of the mills in operation, and that the productivity of the mills will be increased, therefore the security of the bondholders increased by the sale of an idle mill and the employment of the proceeds in the improvement of the machinery of the remaining mills or mill. The right to do this is claimed under the language of Section 1, which authorizes the application of the proceeds of the sale of real or leasehold property to the purchase of other property real or personal, or in betterments of or additions to the mortgaged premises. All machinery and cotton mill machinery is no exception to the rule, is bound to become worn by use or obsolete in form, and day by day suffers some depreciation from use. When as in the present case there is no obligation imposed on the company to repair or keep in repair the machinery, waste is an inevitable result, and it becomes but a question of time when by repetitions of the process now sought to be employed the entire corpus will be consumed.

If Section 2 of this Article had been omitted entirely from the mortgage it is difficult to see how the trustees could, with proper regard to the duties devolved on them, have done otherwise than refuse the demand of the Mt. Vernon-Woodberry Company, but when we examine Section 2, and find the very condition now presented fully covered by its provisions, all possibility of a doubt as to the correctness of the conclusion disappears.

*The decree below will accordingly be affirmed.*
*with costs to the appellee.*

COURT OF APPEALS, Aug. 5th, 1913.

*Upon a motion for a re-argument the following memorandum and order of modification was filed.*

The appellant in the above cause has filed a motion for a reargument "to the end that the decree may be at least modified".

The bill of complaint in the case sought to require the trustees under two mortgages to deliver over to the appellants certain funds in the hands of the trustees "to be applied to the purchase of the machinery" referred to and described in the bill.

The application embodied in the present motion is in substance that in affirming the decree of the Court below in the case, it should be without prejudice to an application for some other investment of the funds in question.

The decree below dismissed the bill, and it is difficult to see how under the prayer of the bill any different application or use of the money could be authorized or made from that asked for in the bill. It may, however, well be that in an appropriate proceeding, and for a proper purpose under the terms of the mortgages, a different disposition of the proceeds derived from the sale of the Greenwood Mill should

be made than to require it to remain permanently in the
hands of the trustees, pending the life of the mortgages, and
that the effect of the dismissal of the bill, with nothing fur-
ther, might be misleading.

> *It is accordingly ordered by the Court of Appeals of
> Maryland this fifth day of August, 1913, that the
> appellees have leave, if they so desire, to show cause
> by answer in writing on or before the 15th day of
> September, 1913, why the decree heretofore passed
> should not be modified by adding thereto language
> to the effect that the dismissal of the bill is without
> prejudice to a further application to the Circuit
> Court of Baltimore City in an appropriate form or
> proceeding for the use of the funds in the hands of
> the trustees arising from the sale of the Greenwood
> Mill for the acquisition of real or personal property
> in accordance with the terms of the mortgages, in
> such manner as not to impair the security of the
> holders of bonds issued under the said two mort-
> gages set forth in these proceedings.*

> *And be it further ordered that a copy of this order be
> served forthwith upon the appellees in this case or
> their attorneys of record.*