# THE MERCANTILE TRUST AND DEPOSIT COMPANY OF BALTIMORE, Trustee,

*vs.*

# THE GOTTLIEB-BAUERNSCHMIDT-STRAUS BREWING COMPANY.

*Corporations: mortgages and deeds of trust; sales of property and reinvestment of proceeds.*

A deed of trust, securing the bonds of an industrial corpora-tion, provided that it might, with the trustee's consent, at any time, exchange for other property, or sell, or lease for any term, any part of the mortgaged property, free and clear, etc., provided the proceeds should, at the option of the corporation, be invested by it, either in the improvement of any part of the property, or in the purchase of other property, real or lease-hold, suitable to promote the business, etc., or in the purchase of other securities, or property, real, leasehold or personal, which should be subject to all trusts, etc.; and if any of the property should be sold, whose proceeds, in the opinion of the corporation, it was not necessary to reinvest for the business, the moneys therefrom should be paid to the trustee to be in-vested in a sinking fund. In pursuance of a matured plan of concentration and economy, communicated in advance to the trustee, whose general assent was obtained, the corporation pro-posed to sell certain plants and pieces of property which were unprofitable to operate, and with the proceeds to make substan-tial additions to its profitable plants, including new buildings, equipment, etc.; the improvements were undertaken and paid for out of funds provided by the company; the properties that were to be sold, being disposed of from time to time according as advantageous sales could be made, and the proceeds paid over to the trustee. When sufficient property had been sold, applica-

tion was made to the trustee to permit the withdrawal and appli-
cation of such proceeds held by it to reimburse the company for
the costs of the improvement so made; upon a case stated, under
the Equity Rules, Code, Article 16, sections 206-8, it was *held,*
that under the circumstances, and in view of all the advantages
to all interests resulting from the investment, objection to such
use of the fund on the ground that all the property purchased
may not be of a strictly permanent character, was not sustain-
able.                                                        p. 510

*Held,* further, that, under the circumstances and according to
the terms of the mortgage, all that would be required was that
there should be a direct and practical relation between the
transactions that produce the funds, and those which provide
the reinvestment.                                            p. 513

It is not necessary, in such cases, to subject the company to
the loss and inconvenience of delaying the improvements until
all the sales had been completed.                           p. 513

*Decided January 15th, 1914.*

Appeal from the Circuit Court of Baltimore City, upon
special case stated.   (BOND, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE,
BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CON-
STABLE, JJ.

*Charles McHenry Howard* (with a brief by *Venable,
Baetjer & Howard*), for the appellants.

*Edgar H. Gans* (with a brief by *Gans & Haman* and
*Crain & Hershey*), for the appellee.

URNER, J., delivered the opinion of the Court.

This is a special case stated under the general equity rules
Nos. 47-49 (Code, Article 16, sections 206-8), and its object
is to obtain a determination of the question as to whether the

proceeds of the sale of certain properties, released from the lien of mortgages given by the Gottlieb-Bauernschmidt-Straus Brewing Company to the Mercantile Trust and Deposit Company of Baltimore, Trustee, are applicable to the payment of the costs of certain improvements to the plant of the former company. The admitted facts are set forth in the statement filed and in exhibits to which it refers and whose recitals are conceded to be correct.

The Brewing Company, on August 10th, 1901, executed and delivered to the Trust Company two deeds of trust, one securing $5,625,000 of first mortgage bonds, and the other $3,500,000 of second mortgage income bonds, all of which have been issued and are now outstanding. Each of the deeds of trust contains provisions that—

"It shall and may be lawful for the Brewing Company, its successors or assigns, by and with the consent and approval of the Trustee, or its successor or successors in the Trust by this instrument created, at any time or times hereafter, to exchange for other property, or sell or lease for any terms, renewable or otherwise, any part or parts of the hereby mortgaged property, free, clear and discharged of and from the lien of this mortgage, * * * Provided, however, that the * * * proceeds of any sale so made shall, at the option of the Brewing Company, be invested by it either in the improvement of any other part of the said premises hereby mortgaged, or in the purchase of other property, real or leasehold, suitable to promote the business of the Brewing Company, or other securities or property, real, leasehold or personal, which property so purchased * * * shall be subject to all the trusts, and with all the powers in grantor and grantee hereby declared (including that of sale, lease, and exchange) of and concerning the property described in this Indenture of Mortgage, and shall be conveyed to the Trustee * * * subject to the same trusts herein declared."

It was provided that the assent of the trustee to the sale, exchange or other disposition by the Brewing Company of any of the mortgaged property, should, with respect to real or leasehold estates, or stocks of other companies, be expressed by the joinder of the Trustee in the transfer, and that as regards personal property, other than leasehold or stocks of other companies, the trustee's consent should be implied, in the absence of the communication of its dissent in writing to the proposed transferee, the object of this stipulation being

> "to allow the Brewing Company to use and employ the personal property, other than leasehold, and stocks in other companies, hereby conveyed, and to dispose of the same, or any part or parts thereof, until default hereunder, by sale or otherwise, as often as may be found expedient for the Brewing Company in the proper conduct of its business, so as to manage the same as the Brewing Company may deem best for the useful and profitable government of its affairs."

A provision then followed that if any property should be sold the proceeds of which were not necessary in the opinion of the Brewing Company to be reinvested for the business, the moneys thus derived should be paid to the trustee to be invested in the sinking fund prescribed by the deed of trust.

The practice of the trustee, when assenting to a sale and executing a release of any part of the mortgaged property, was to require the proceeds of the sale to be deposited in its hands pending their reinvestment. When the statement of the present case was filed in August, 1913, the trustee held for the sales of property account the sum of $55,662.62. In the previous March $27,214 had been paid out of the account for improvements at a plant of the Brewing Company known as its "Globe Branch." The funds thus expended, and those now held by the trustee, were realized from property sold in pursuance of a policy formulated by the Brewing Company in February. 1912. This policy was adopted for

the purpose of concentrating the company's operations and avoiding the loss produced by unprofitable and idle properties. By a resolution then passed by its executive committee provision was made for the consolidation of the Darley Park and Globe branches of the company, the removal of the equipment from its general bottling works, and the establishment of separate bottling plants at the Globe, Bauernschmidt and National branches. These changes included the construction of a "racking room, wash-house, stable and bottling house at the Globe, * * * such additions and new machinery as may be necessary at the Globe Branch Bottling House and Brewery to accommodate the business to be brought into that branch from the Darley Park Branch, new bottling house on the lot adjoining the Bauernschmidt Branch, and the removal thereto of certain machinery from the General Bottling House, and installation of such new machinery as may be necessary." The additions, improvements and machinery thus specified were estimated to cost from $50,000 to $75,000, not including the cost of machinery to be removed from the old to the new locations. It was provided in the resolution that application be made to the Mercantile Trust Company, Trustee, for its assent to the withdrawal from the sales of property account of any funds which might come into its hands from the sale of any of the company's property during the progress of the stated improvements. A letter written to the Trust Company at that period by the President of the Brewing Company, after describing the plans already indicated and explaining that they were designed to promote large economies in manufacture and were expected to produce an increase of $100,000 per annum in the net earnings of the company, proceed as follows:

> "The company desires to pay for these improvements, which will amount to from $50,000 to $75,000, out of the proceeds of sales of property that it may sell while the improvements are in progress, or as soon thereafter as possible. To that end, it has placed in the hands of Messrs. Caughy, Hearn & Carter, prop-

erty agents, for sale, the Bay View, Lion, Mount and
Baltimore Brewery properties; the North Street Malt
House, and the Central Avenue and Fawn Street build-
ing, together with some sixty pieces of tenant prop-
erty formerly occupied as saloons. The proceeds of
the sale of any one or more of these properties will,
of course, be deposited in your hands to the credit of
proceeds of sale of property account, subject to the
conditions applying to that fund. This company now
desires to arrange with you as Trustee that any funds
coming into the proceeds of sales of property account
may be withdrawn and applied towards the payment
of the improvements above mentioned, or to reim-
burse the treasury of the company for any payments
it may make out of its working capital for said im-
provements, and additions and machinery, as the work
progresses. We would thank you for an early reply,
as these improvements are imperatively necessary, and
should be begun without delay."

In replying to this letter the Trust Company transmitted
an opinion, given by its attorneys, on the subject and said:
"We presume that the requirements which they
make in connection with the sale of this property,
and the investment of the fund, can be arranged to the
satisfaction of this Company as Trustee."

The opinion, so far as it is necessary to be stated, was to
the effect that the proposed application of the proceeds of
sales appeared to be within the terms of the mortgages and
proper to be made, provided the improvements were of a
permanent character and, if made in advance of the receipt
of the required fund by the trustee, were sufficiently related
in point of time and otherwise to show that the expenditure
was really a reinvestment of the proceeds of the sales in ques-
tion. The Brewing Company in its reply said that there
would be no difficulty in its complying with the requirements
of the opinion to the satisfaction of the Trust Company, and

that the contemplated improvements were all of a permanent character" and would "add to the value and efficiency of the plants."

In May, 1912, there was a change in the management of the Brewing Company, and its plans for the improvement of its plants were modified and enlarged. The following January its executive committee passed a resolution reciting that extensive improvements had been undertaken at its Globe and National Breweries, and that it was the purpose of the company to dispose of a large number of saloon properties, and of certain idle and abandoned brewery plants and other specified premises, all of which were no longer necessary for use in connection with the company's business, that pending the sale of these properties the company would be obliged to make payments for the labor and materials required for the improvements and to obtain temporary loans for that purpose until the proceeds of the sale of the properties being disposed of should be received, and it was therefore resolved that the Mercantile Trust Company, Trustee, be informed of this situation so that, as requests were made from time to time for the withdrawal of funds from the sales of property account, the Trustee would be advised as to the method under which the improvements were undertaken and would accordingly assent to the proposed application of the funds. A copy of this resolution was duly delivered to the Trust Company. On March 27, 1913, the Brewing Company requested, and the trustee consented to, the withdrawal of the sum of $27,-214, as previously mentioned, to be used in paying for certain machinery and equipment installed in the new bottling house at the Globe branch. Early in August the Brewing Company applied to the trustee for the appropriation of the further sum of $55,308, from the proceeds of property sales for improvements, additions and equipment at the same plant. The trustee had in hand at that time, as already stated, a fund of $55,662.62 realized from sales, and it was willing to make the payment in question if it could do so consistently with a due regard for the interests it represents.

but it has withheld its consent to further withdrawals for the purposes stated until certain doubts which it entertains as to its right to comply with such requests have been judicially considered and settled.

The trustee has difficulty with respect to the following questions: First, whether the improvements to which the money is to be applied are of a sufficiently permanent character to be proper objects for the application of the sales fund under the terms of the deeds of trust; and, secondly, whether repayments of temporary loans contracted by the Brewing Company for improvements which were made in whole or in part before the sale of the property from which the present fund was derived can be regarded as a suitable reinvestment under the provisions we have quoted. Inasmuch as there are other properties in process of being sold, and as their proceeds will be desired by the company for application to the costs of the improvements, the case stated seeks a direction to the trustee as to whether it shall permit the withdrawal of the moneys now in the sales account for the purpose of reimbursing the Brewing Company for the stated expenditures of $55,308, and also whether it shall allow the proceeds of properties whose sale is intended, but which have not yet been sold, to be withdrawn for similar purposes.

The questions thus submitted were answered by the Court below in favor of the right of the Brewing Company to have the funds applied as it has proposed, and we concur in that conclusion.

There is no stipulation in the deeds of trust that the property in which the proceeds of sales may be invested shall be of a permanent character. The reinvestment is permitted to be made "either in the improvement of any other part" of the mortgaged premises, "or in the purchase of other property, real or leasehold, suitable to promote the business of the Brewing Company, or of securities or properties, real, leasehold or personal." The application of the funds to any of this comprehensive class of objects is distinctly left to "the option of the Brewing Company." It is evident upon the

record that the improvements, additions, equipment and machinery to the company's plant are all substantial and durable, and that the greater part of the cost is being incurred for buildings and structures which can only be classed as permanent.  The expenditures for all these purposes are being made in pursuance of a matured policy of concentration and economy in the conduct of the enterprise.  There is no loss of value or security to which the bondholders under the deeds of trust will be exposed if the company's plans are executed.  It is admitted that the improvements and installations in question are adding to the value of the company's property at least to the extent of their cost, and that they will probably effect a large increase of the earnings in which the bondholders generally are interested and upon which the income bondholders in particular are dependent. In view of the ample authority reserved in the deeds of trust for such appropriations, and of the certain advantage to all interests resulting from the investment under consideration, the objection to this use of the fund on the ground that all of the property purchased may not be of a strictly permanent nature is not sustainable.

The trustee refers to the decision of this Court in *Mt. Vernon-Woodberry Cotton Duck Company* v. *Continental Trust Company,* 121 Md. 163, as suggesting and supporting the position it has taken upon this subject.  In that case the mortgage given by the Mt. Vernon-Woodberry Company provided that the proceeds of any sales of mortgaged property, made with the consent of the trustees representing the bondholders, should be "set apart and held in trust and applied to the purchase of other property, real or personal, or in betterments of or additions to the mortgaged premises;" and there was a separate provision that the mortgagor company should "have full power, in its discretion, from time to time, to dispose of any portion of the machinery, equipment, furniture and implements, * * * which may have become obsolete or otherwise unfit for such use, replacing the same

by new machinery, equipment, furniture or implements, which shall become subject to this indenture." One of the company's plants known as the Greenwood Mill was dismantled and subsequently sold, and the promissory note for $300,000.00 given for the purchase price was delivered to the trustees. Before this sale was consummated the Consolidated Cotton Duck Company, which owned a controlling interest in the capital stock of the Mt. Vernon-Woodberry Company, arranged to replace the machinery in certain mills of that company with more modern appliances, in consideration of the payment by the latter to the former company of 6 per cent. of the cost as rental for the new machinery, and a further amount as allowance for depreciation, with the right to the Mt. Vernon-Woodberry Company to purchase the equipment, and to the Consolidated Company to remove it if the conditions of the agreement were not performed. When the sale of the Greenwood Mill was completed, application was made to the trustees by the mortgagor company to have the promissory note for the purchase price of the property transferred to the Consolidated Company in payment to that extent for the new machinery it had installed upon the terms indicated. The trustees having declined to make the proposed transfer, a bill was filed to require compliance with the request. In the opinion prepared by JUDGE STOCKBRIDGE it was noted that the proceeds of the old machinery, which was apparently sold as junk, were not applied to the purchase of the new equipment, and that the "schedules presented, upon which the demand for the $300,000 was based, were not schedules of the machinery purchased or leased, but," as testified, "were schedules 'gotten up to make a sum adequate to cover' the amount for which the Greenwood Mill was sold." The opinion stated that the clauses quoted from the mortgage "provided specifically for two entirely separate and distinct matters. The first provides the method by which real or leasehold property belonging to the company and subject to the mortgage may be sold and released from the effect and

operation of the mortgage, by joint action of the mortgagor and trustee, and for the disposition of any moneys realized from any such sale or sales. The second deals with the maintenance of the plant by providing for the disposition by the company, without the intervention of the trustees, of machinery, equipment or implements, which shall then become subject to the mortgage; and also for the sale of the manufactured products of the company. What was done by the company in disposing of the old machinery and replacing with new, therefore, came exactly within terms of section 2." Reference was then made to the contention that "as it is provided by section 1 that the proceeds derived from the sale of real or leasehold property may be 'applied to the purchase of other property, real or personal, or in betterments of or additions to the mortgaged premises,' the use of the $300,000 purchase money of the Greenwood Mill is authorized to be applied to the payment for the replaced machinery as a betterment of or addition to the mortgaged property." "With that contention," said the opinion, "this Court cannot agree. This section expressly provides that the moneys so derived *shall be set apart and held in trust,* and applied to the purchase of other property. If language means anything, this can only mean that inasmuch as the sale of any real or leasehold property covered by the mortgage is a diminution, *pro tanto,* of the security pledged for the mortgage debt, the *cestuis que trustent,* the bondholders, are entitled to have the money so applied as to restore the security which they had before any sale had taken place."

In the present case there is no proposal to use the funds in question merely to replace old and discarded machinery, nor is there any provision in the mortgage now before us distinquishing such substitution from the reinvestment contemplated for the proceeds of the sale of any of the mortgaged property. The plan of improvements in this instance involves the consolidation of certain plants, the removal and concentration of existing machinery for that purpose, the con-

struction and the remodeling of buildings, and the installation of additional equipment. The values thus brought under the mortgage lien are direct and adequate substitutions for the property sold, and are not intended to supply losses of value and utility resulting from the use and depreciation of the plants. There are important distinctions, therefore, between the present question and the one decided in the *Mt. Vernon-Woodberry Company case,* and we can see no reason to apply the principle of that decision to the very different contractual and other conditions shown by this record.

The inquiry as to whether the proceeds of the property sales are available to reimburse the mortgagor company for expenditures made on the improvements in advance of the sales from which the funds in question are derived is readily answered by reference to the conceded fact that the sales and the improvements were projected at the same time as interdependent parts of one general and consistent policy. The deeds of trust provide simply that the proceeds of such sales may be invested at the option of the mortgagor company in the improvement of other portions of the mortgaged premises or in the purchase of other real or personal property. There is nothing in this provision with which the concurrent plans of sale and improvement here presented are in conflict. In view of the large number of the properties to be sold, it would have subjected the company to undue inconvenience and continuing loss to defer the improvements until the sales had all been completed. There is a direct and practical relation between the transactions which produce the funds and those which provide the reinvestments, and this is all that can be reasonably required.

> *Decree affirmed, the costs to be paid out of the funds held by the Trustee.*